Filed 9/25/13  P. v. Cruz CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ANTERO CRUZ,<br><br>        Defendant and Appellant. | D061641<br><br><br>(Super. Ct. No. SCD230448) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert F. O'Neill, Judge.  Affirmed.

Cannon & Harris and Gregory L. Cannon for the Defendant and Appellant, under appointment by the Court of Appeal.

Kamala D. Harris, Attorney General, Dane R. Gillette, Julie L. Garland, Assistant Attorneys General, Barry Carlton, Teresa Torreblanca, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Antero Cruz of the first degree murder of Ahlyja Pinson (Pen. Code,[1] §§ 187, subd. (a), 189) and found true allegations that he personally used a dangerous and deadly weapon in the commission of the offense (§ 12022, subd. (b)(1)). The trial court sentenced Cruz to a prison term of 25 years to life plus one year for the personal use allegation. Cruz contends the trial court prejudicially abused its discretion by excluding certain impeachment evidence. He further contends the court erred by failing to instruct the jury on principles of aiding and abetting, refusing to give his requested pinpoint instruction on third party culpability, and modifying CALCRIM No. 521. Cruz contends the cumulative effect of these errors requires reversal of the judgment. Finally, Cruz asks us to independently review the record, including sealed materials, to determine whether the court properly excluded evidence of the identity of a confidential informant who related information about Duarte. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Evidence Concerning Pinson's Death and Whereabouts on December 31, 2007*

On December 31, 2007, 14-year-old Pinson was found dead in an abandoned house in Golden Hill. William Gwyn, a homeless man who at the time of trial was in custody for failing to register as a sex offender, found her body and flagged down a person who called police.

Earlier that afternoon, Gwyn had been standing on a hill close to the abandoned house when he saw a male and female talking to one another in Spanish. The female,

---

[1]     Statutory references are to the Penal Code unless otherwise indicated.

later determined to be Pinson, was Mexican with light skin, brown hair, light blue jeans and a dark shirt. The man was about five feet nine inches tall and Gwyn described him as chubby with a round face like a bulldog, a shaved head, and stomach overhanging his belt. The man was wearing a white T-shirt and blue jeans. It seemed to Gwyn that they knew each other, and neither of them appeared upset or angry. The couple walked by about 20 feet away from Gwyn and left in an older model brown car with a loud muffler and a twelve-inch red bow on the front grill. Gwyn eventually entered the abandoned house and started to fall asleep on a mattress. He smelled marijuana.

Gwyn got up, walked upstairs and was rummaging through some clothing he found when he heard the vehicle with the red bow and loud muffler return. He saw the same couple walk down the hill toward the back of the house. Gwyn left the house and sat down in the backyard, then saw the couple, now wearing dark jackets, reenter the house. After about an hour, Gwyn decided to see if he could smoke marijuana with the couple. He stepped into the back door's threshold, but left after he heard someone say, "shhhh." Gwyn walked away and started looking for recyclables, but after 45 minutes to an hour he returned to the abandoned house. Gwyn entered the house through the front door and thought he heard a footstep downstairs, so he left and went around to the back door to see if the couple was still there. When he turned on his lighter to see in the dark, he saw the body of the girl he had seen earlier and blood smeared on the wall. He lit some candles so he could see better, but heard a noise and bolted, terror-stricken, after he spotted a figure in the bushes.

3

Police arrived at the scene at around 7:22 p.m. and contacted Gwyn. They observed severe trauma to Pinson's face and head, and large amounts of blood on the floor, walls and ceiling. Pinson was not wearing shoes, but there was no visible blood on the soles of her socks. She was lying on her back with her left arm twisted under her and her right arm over her waist. Her head was turned to the right and positioned between a small mattress and the wall. There was a large pool of blood under her body and large bloodstains on the corner of the mattress and around Pinson's head. A trail of blood drops led out the back door of the house. There were no signs of a sexual assault.

At about 2:00 p.m. that day, Pinson had left the home of her aunt to spend New Year's Eve with her cousin, Karen Cervantes, who lived in a house on J Street. Pinson was wearing light blue jeans, a red lace top, a black jacket, black shoes and ankle socks. Her nails were short due to her habit of biting them. Cervantes had received a phone message from Pinson that morning that Pinson was on her way, but Pinson never arrived.

Fanny Vidal was approaching her and Cruz's home on Clay Street when she saw Pinson standing outside. At the time, Fanny was in a relationship with Cruz, who was standing in the open front doorway while Fanny asked Pinson what she was doing there. Pinson said she was looking for Cervantes. Cruz had been unfaithful to Fanny and conceived a child with Fanny's friend, Crystal Lopez; therefore, Fanny did not trust Cruz around her girlfriends. After Pinson left, Fanny asked Cruz what Pinson was doing at the house. Cruz and Pinson knew each other but according to Fanny, did not talk. Pinson and Lopez had some history; Pinson and Fanny's younger sister had at some point fought with Lopez due to Lopez's infidelity with Cruz.

4

After Pinson left, Cruz started looking for his car keys and he left about five or six minutes after Pinson, telling Fanny he was going to his mother's house. Cruz was driving a black Toyota Cressida with a red and gold Christmas bow on the front grill. Fanny asked him to take their oldest son with him, but Cruz declined, telling her he was going to smoke marijuana in the car. This was unusual to Fanny because Cruz normally took his son to his mother's house, and Cruz smoked marijuana around his son. After Cruz left, his mother arrived at the house on foot, looking for him. Fanny told her Cruz had just left for her house; his mother stayed for 30 to 45 minutes then left.

*Cruz's Actions on the Afternoon of Pinson's Death and Thereafter*

Sometime that afternoon, around dusk, Cruz appeared at the home of another member of his gang, Gustavo Salgado, who was with his girlfriend, Erika Campos. Salgado and Cruz were not friends but acquaintances. Cruz had blood on the front of his white T-shirt, and asked Salgado for clothes. Salgado had been asleep on the couch and was surprised to see Cruz, who was looking out the window acting nervous and paranoid. Salgado asked Cruz what had happened, but he would not say, telling Salgado it was "better for [him] not to know." Salgado gave him a shirt, blue jeans and shoes and Cruz washed his hands and changed into them. Cruz asked Salgado if he could leave his clothes but Salgado said no, so Cruz put his other clothes in a bag and took them with him. Campos also noticed Cruz acting paranoid and jittery. She saw blood on Cruz's hands and very noticeable, solid blood on the front of his light shirt from the chest to the abdomen area. When Salgado asked what had happened, Campos heard Cruz say, "Oh, trust me. You don't want to know."

5

Cruz returned to his house around 7:50 p.m. and walked straight to their bedroom without saying hello to Fanny, her sister and another friend. When Fanny entered the room and asked Cruz what was wrong, he replied, "If the police ever come to the house, tell them that I was with you the whole time, with you and the kids." Cruz was wearing different clothing than when he left, and appeared nervous. Fanny asked why Cruz was wearing clothing too large for him, and he told her he had gotten into a fight with other gang members, had stabbed one of the men, and got blood on his clothes. Fanny saw a smudge of blood on Cruz's arm. Fanny thought his comment was odd because the rival gang members would not talk to police. The next morning, Cruz cleaned the trunk of his car with bleach. He told Fanny he was cleaning blood that had dripped in the trunk from a bloody shank. Cruz told her he had thrown away the trunk liner that had been in the car the day before.

A few days later, police came to Fanny's house and asked if she knew Pinson, telling her Pinson had been killed inside an abandoned house. Fanny cried, but Cruz said nothing. After police left, Fanny was suspicious that something had happened between Cruz and Pinson. On January 10, 2008, police returned and arrested Cruz. Fanny initially lied to police about Cruz's whereabouts that day. She eventually told them the truth about what happened on the day Pinson was killed.

*Forensic Evidence*

The medical examiner estimated Pinson's time of death between 6:00 p.m. and 7:00 p.m. on December 31, 2007. Pinson had numerous injuries, including bruising, scrapes, and puncture wounds on her face, and 17 distinct lacerations on her scalp. She

6

had severe fractures in her skull and face, and 70 different puncture wounds on her body. A toxicology report indicated she had used marijuana at some point. Her skull fractures were fatal injuries. Pinson's DNA was found on the mouth of a beer bottle found near her body. All of the blood drops leading out of the house matched Pinson's DNA blood type.

Cruz's fingerprints were found on a brown paper bag located at the base of a spiral staircase at the abandoned house. Cruz's right palm print was found on the east wall of the main room near Pinson's body. Cruz's DNA was found on a cigarette butt found directly west of the steps to the door of the house. Pinson's DNA was found in the rubber gasket taken from the trunk of Cruz's car.

The DNA of others were also found in the abandoned house and mixed with Pinson's DNA. The DNA of a man identified by police as Orlando Duarte was found on two cigarette butts and adhesive bandages attached to a calendar page. One of the DNA samples on the mattress by Pinson's body could have been from Duarte. The criminalist explained that DNA can be transferred to an object even without physical contact by the DNA's source, by ways such as transference, sneezing, spit or urine; the DNA can last for years under certain conditions.

Criminalists determined that DNA found in fingernail scrapings from Pinson's left hand was a mixture of Pinson's and possibly that of Duarte. Pinson's nail beds were shorter than her fingertips, so the forensic examiner explained the scraping she performed would go across the top of Pinson's thumb and it was possible the instrument would pick up not only what was underneath the fingernail, but also on the fingertips. In that left hand fingernail sample, there were no nucleated epithelial cells. The criminalist

7

explained that if Pinson had scratched her attacker, such cells might appear in the sample. She testified if Pinson's fingers were wet and wiped the floor containing Duarte's DNA, his DNA would possibly transfer to her fingertips. A DNA testing expert testified there was a reasonable explanation for the presence of Duarte's DNA on Pinson's fingertips assuming she was killed on the mattress and had never had physical contact with Duarte: if Pinson was struggling on the mattress and reached down and scratched it to get away, his DNA would have been transferred from the mattress to her fingernails.

*Cruz's and Duarte's Interviews with Police*

Police arrested and first interviewed Cruz on January 10, 2008, after finding his palm print at the abandoned house. He had a small scratch on his right wrist. Cruz was eventually released, but in October 2010 he was rearrested and reinterviewed.

Cruz gave varying accounts during his interviews. In his first interview, he told police that Pinson had stopped by his house, talked with Fanny outside, and left. He claimed that afterwards, he and Fanny stayed together all night, first at their home and then at the home of one of Fanny's friends. He denied he had ever been to the abandoned house where Pinson's body was found. When informed that Fanny had told police he left the house after Pinson, Cruz told police he and Fanny argued and he walked to his father's house. Cruz then told police he had been in the abandoned house, but only the top floor, to smoke marijuana with a friend. He also said, inconsistently, that he drove to his father's house. He later admitted he never went to his father's house. Cruz eventually told police he had been in a fistfight with another gang member (identifying him first as Cisco and then Nacio) and got bloody from the other man's nose. Cruz told police he

8

changed his clothes with an extra T-shirt he had with him. Cruz claimed he had previously lied because he was nervous and did not know what to say.

Police interviewed Duarte on January 24, 2008. Duarte, who was homeless and out of work at the time, initially denied ever entering the abandoned house, claiming he had merely passed it on the street, but when shown a picture of the inside, he admitted entering it to pick up cans for recycling. When confronted with the fact his DNA was present under Pinson's fingernails, he denied knowing Pinson or killing her, and he asked police to check his skin, telling them he preferred men over women. Police took photographs of Duarte but found no scratches on his face, chest or arms. Duarte was eventually released.

In Cruz's October 28, 2010 police interview, he claimed to have picked up three friends and gotten into a fight with other gang members, where someone got "shanked" and his shirt got bloody. He said he was at the abandoned house to smoke marijuana and drink. Cruz was booked into jail where he made several phone calls to Lopez, who read him most of his arrest warrant. After he made those calls, Cruz was reinterviewed in jail on October 29, 2010. This time, Cruz claimed that after he left his house on the day of the murder, he saw Pinson with two other "taggers" at a park, Aaron and Eric (respectively known as "Tess" and "Stomps"[2]), who were brothers or cousins. He wanted to apologize to Pinson so he approached them and eventually ended up at the abandoned house with them to smoke marijuana and drink beer. According to Cruz, he

---

2    A San Diego Police Department detective assigned to monitor Hispanic street gangs testified he had never located any such persons.

left to get cigarettes at Aaron's request and when he returned, Pinson was dead and Aaron and Eric were running away. Cruz grabbed Pinson's purse and left in a panic. He claimed Pinson's blood got in his car trunk from her purse.

*Duarte's Trial Testimony*

The District Attorney granted Duarte immunity and put him up at a motel. Duarte testified at trial that in December 2007 he was homeless and made money by recycling, and went to the abandoned house about twice a week to collect recyclables. Duarte admitted selling drugs ("crystal") for a woman who gave him a place to stay. He learned after he moved out that she had connections to the Mexican Mafia.

Duarte acknowledged his arrest for Pinson's murder, but testified he had nothing to do with it. According to Duarte, he had entered the bottom part of the house about a week before Pinson's murder and heard a man and woman arguing there. Duarte testified he smoked cigarettes on the outside of the house and urinated in different places close to its entrance, and also in the bathroom downstairs. He also spit in various areas because he was smoking and drinking. Duarte claimed that while he was dropping his bags off, he had looked in the room and seen the mattress in the place it was located where Pinson's body was found, but denied ever touching it. When shown the picture of the bandages on the calendar page, Duarte testified he could not remember whether or not he had worn bandages when he was at the property; but it was possible because he often cut himself on glass. Duarte also testified that he was not sexually attracted to women. During Duarte's cross-examination, Duarte admitted he had earlier told police he had

10

never been in the house or seen the mattress.  He claimed he remembered the events better at trial.

DISCUSSION

I. *Exclusion of Prior Act/Third Party Culpability Evidence*

Before trial, the People moved in limine to exclude certain prior act evidence concerning Duarte: namely, that in March 2011 Duarte was arrested after he had been assertedly caught kneeling in front of a developmentally disabled 13-year-old girl, whose pants and underwear were down around her ankles.  In its motion, the People recounted that Duarte was living in the home with the girl and her family; that the girl's mother had asked Duarte to watch the girl while she was gone, and did not believe Duarte had touched her because he was gay.  Duarte initially told police he was not in the room when the girl was taking off her pants.  He later admitted he was there but denied any inappropriate touching; he said he was helping the girl remove her shoes while she was changing into her pajamas when her brother walked in the room.  The girl told her mother before and after a forensic interview that Duarte did not touch her private parts.  According to the People, no formal charges were brought, and after a full investigation the District Attorney rejected the case.

In ruling on the People's motion, the trial court confirmed that Duarte was not convicted of any crime.  It weighed the evidence under Evidence Code section 352 and

11

reasoned it was not probative absent Duarte's conviction for a sexually-related offense.[3] The court gave defense counsel wide latitude to cross-examine any witnesses or experts about Duarte's DNA and where it was found on Pinson's body, and it permitted Duarte to testify about his sexual orientation.

Cruz contends the trial court prejudicially erred by granting the People's motion because the evidence tended to impeach Duarte's testimony that he was a homosexual who had no reason or motive to kill Pinson. Cruz maintains the court's ruling violated his rights under the state and federal Constitutions to present a third party culpability defense and to confront the witnesses against him; he adds the error is not harmless under either the more stringent beyond-a-reasonable-doubt prejudice standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) or the state law standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). Cruz points to the inconsistencies in Duarte's stories to police, and argues that absent the excluded evidence the jury was left with an incomplete and inaccurate picture suggesting Duarte had no sexual motive for attacking Pinson.

We reject Cruz's contention regarding a supposed violation of his right to present a third party culpability defense. A defendant's right to present a defense is not infringed by a trial court's application of well-established evidentiary rules permitting it to exclude

---

3       The court stated: "The way I see it is, I don't see what the relevance or the probative value of it [the March 2011 incident] is. If there was some other evidence that Mr. Duarte had previously been convicted of some sexually-related offense, that would be a different story, but we have some circumstances that were investigated and a decision made not to pursue it in the criminal courts. I don't see the probative value of it."

evidence if its probative value is outweighed by certain other factors, such as unfair prejudice, confusion of the issues, or potential to mislead the jury. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1259; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103 [application of the ordinary rules of evidence does not impermissibly infringe on a defendant's right to present a defense]; *People v. Hall* (1986) 41 Cal.3d 826, 834 [same].) In particular, third-party culpability evidence may be excluded where it does not sufficiently connect the other person to the crime, or where the evidence is speculative or remote. (*Gonzales*, at p. 1259.)

We acknowledge that the trial court excluded the evidence as irrelevant. But on appeal we consider the correctness of the trial court's ruling itself, not the correctness of the trial court's reasons for reaching its decision; if the ruling is correct on any theory of the law applicable to the case, it must be sustained regardless of the considerations that may have moved the trial court to its conclusion. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145; *People v. Zapien* (1993) 4 Cal.4th 929, 976.) Here, the evidence that Duarte may have engaged in heterosexual activity was itself at best weak and speculative (being dependent upon the account from the 13-year-old girl's brother, which would have been weighed against contrary testimony from the girl and her mother), and would have had only a remote connection to Pinson's murder, particularly where there was no indication Pinson was sexually assaulted or otherwise involved in sexual activity before her death. And, in any event, exclusion of the evidence concerning Duarte did not impair Cruz's right to present a third party culpability defense because Cruz presented DNA evidence implicating Duarte, and explored Duarte's inconsistent stories to police.

13

(*People v. Cunningham* (2001) 25 Cal.4th 926, 999 [exclusion of defense evidence on a subsidiary point does not interfere with the constitutional right to present a defense; any such error is governed by the *Watson* standard of review]; *People v. Page* (1991) 2 Cal.App.4th 161, 185 [trial court's ruling was not a "blanket exclusion" that stripped defendant of his defense].)  Thus, there " ' " 'was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' " ' " (*People v. Anderson* (2012) 207 Cal.App.4th 1440, 1471, quoting *People v. Boyette* (2002) 29 Cal.4th 381, 428; see also *People v. Espinoza* (1992) 3 Cal.4th 806, 818 [distinguishing situations where a defendant was "not foreclosed from effectively challenging the prosecution's case or from presenting crucial exculpatory evidence"].)

Nor do we perceive any violation of Cruz's constitutional right to confront or cross-examine witnesses.[4]  It is settled that "not every restriction on a defendant's desired method of cross-examination is a constitutional violation."  (*People v. Chatman* (2006) 38 Cal.4th 344, 372.)  Trial judges "retain[ ] wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance."  (*Ibid*.)  A Confrontation Clause violation may arise, however, where a defendant can show he was prevented " ' "from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and

---

[4]     The Confrontation Clause of the Sixth Amendment states:  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.; see also Cal. Const., art. I, § 15 ["The defendant in a criminal cause has the right . . . to be confronted with the witnesses against the defendant"].)

14

thereby, 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' " ' " (*Ibid*.) The defendant must show the prohibited cross-examination would have produced " ' "a significantly different impression of [the witnesses'] credibility . . . ." ' " (*Ibid*.; *People v. Brady* (2010) 50 Cal.4th 547, 560.)

As stated, the excluded evidence was speculative and remote, and, in our view, would not have produced a *significantly* different impression of Duarte's already-compromised credibility. Duarte was cross-examined by Cruz's counsel on all of the matters tending to tie Duarte to Pinson and the abandoned house. He was also extensively cross-examined about his drug-selling and his inconsistent stories to police about Pinson's murder. Cruz's counsel cross-examined one of the police detectives who had interviewed Duarte about Duarte's changing stories. The Confrontation Clause of the Sixth Amendment "has long been read as securing an adequate *opportunity* to cross-examine adverse witnesses." (*United States v. Owens* (1988) 484 U.S. 554, 557, italics added.) It does not guarantee " ' "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ' " (*Id*. at p. 559; *People v. Perez* (2000) 82 Cal.App.4th 760, 765.) Here, the jury had the opportunity to assess Duarte's demeanor and credibility at trial. (E.g., *People v. Perez*, at p. 766.) These circumstances met Cruz's constitutional right to confrontation. (*Ibid*.)

Finally, even if we were to conclude the trial court erred in its evidentiary ruling, the error was harmless under either prejudice standard. (Accord, *People v. Brady*, *supra*, 50 Cal.4th at pp. 560-561.) It is fair to say that the circumstantial evidence of Cruz's guilt

15

is overwhelming: Fanny testified that Cruz left their house in his car with the distinctive ribbon on the grill shortly after Pinson left; the jury could reasonably infer from Gwyn's testimony concerning the car with a bow that Cruz was at the scene of the crime with Pinson; on the evening of Pinson's murder Salgado and his girlfriend observed blood splattered on Cruz's T-shirt and pants; Pinson's blood was found in the trunk gasket of Cruz's car; Cruz's palm print was found near Pinson's body; and Cruz's DNA was found on cigarette butts at the scene. Pinson's prior altercation with Lopez may have given Cruz a reason to harm Pinson, and Cruz gave police varying stories, suggesting consciousness of guilt. Forensic experts explained the presence of Duarte's DNA on Pinson's fingernail scraping as possibly resulting from transference or contamination from Duarte being in the abandoned house. Under the circumstances, Cruz fails to demonstrate prejudice under the standards of either *Chapman*, *supra*, 386 U.S. 18 or *Watson*, *supra*, 46 Cal.2d 818.

## II. *Claims of Instructional Error*

Cruz contends the trial court erred in connection with the jury's instructions. Specifically, he maintains the court prejudicially erred by failing to instruct the jury on principles of aiding and abetting; refusing his third party culpability pinpoint instruction; and modifying CALCRIM No. 521 to omit references to second degree murder. We address his contentions in turn.

### A. *Failure to Instruct on Principles of Aiding and Abetting*

Cruz argues the trial court had a sua sponte duty to instruct the jury on the principles of aiding and abetting; that based on his testimony that Pinson was killed by

16

another person—Aaron or Eric—after he brought her to the abandoned house, the jury could have concluded he was an aider and abettor because he facilitated her killing by bringing her to the abandoned house.

The People respond that Cruz invited the error. We agree. Defense counsel objected to the prosecutor's request to instruct the jury with CALCRIM Nos. 400 and 401, arguing it was entirely opposite to the People's theory of the case, which was that Pinson was killed by a single perpetrator. Defense counsel asked the court instead to instruct the jury with Cruz's requested pinpoint instruction as to third party culpability. The trial court took the matter under submission but ultimately acceded, ruling, based on the direct and circumstantial evidence, that there was an insufficient showing of Cruz's liability as an aider and abettor.

" 'When a defense attorney makes a "conscious, deliberate tactical choice" to [request or] forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was [given or] omitted in error.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 675.) Defense counsel had an obvious tactical reason for her objection and request because there was evidence only one person murdered Pinson, and defense counsel sought to rely on a third party culpability defense, namely, that Duarte killed her. Accordingly, Cruz may not now complain about the results of defense counsel's choice.

B. *Refusal to Instruct with Cruz's Requested Third Party Culpability Pinpoint Instruction*

Cruz contends the court prejudicially erred by declining his requested jury instruction as to third party culpability, which read: "You have heard evidence that a person other than the defendant committed the offense with which the defendant is

17

charged. The defendant is not required to prove the other person's guilt. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt. Therefore, the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt. Evidence that another person committed the charged offense may by itself raise a reasonable doubt as to the defendant's guilt. However, its weight and significance, if any, are matters for your determination. If after considering all of the evidence, including any evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty." Cruz maintains the court's error was compounded by the fact it misread the jury instruction on corpus delicti, which assertedly reinforced the idea that Cruz had to prove the identity of the assailant beyond a reasonable doubt.

The People respond that the instruction was argumentative and added little to the reasonable doubt jury instruction, and any error was harmless in view of the instructions as a whole as well as defense counsel's argument that Duarte committed the offense.

We conclude Cruz was not prejudiced by the trial court's refusal to give the instruction. " ' "[I]n appropriate circumstances" a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case . . . . [Citations.] But [it] need not give a pinpoint instruction if it is argumentative [citation] [or] merely duplicates other instructions . . . .' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 500.) In *Hartsch*, the California Supreme Court considered and rejected an argument that the trial court prejudicially erred by not giving a requested pinpoint instruction on third party culpability. (*Hartsch*, at p. 504; see also *People v. Ledesma* (2006) 39 Cal.4th 641,

18

720-721; *People v. Earp* (1999) 20 Cal.4th 826, 887 (*Earp*).) There, as in this case, the proposed instruction would have informed the jury that the defendant was not required to *prove* third party culpability, and that the inquiry remained whether the jury had a reasonable doubt as to whether the defendant committed the charged offense. (*Hartsch,* at p. 504; see also *Earp*, at p. 887.)

Observing that third party culpability instructions "add little to the standard instruction on reasonable doubt," the court in *Hartsch* held that if the trial court erred in declining to give the instruction, it could not have affected the verdict, particularly where the closing arguments focused the jury's attention on the point. (*Hartsch*, *supra*, 49 Cal.4th at p. 504.) *Hartsch*'s reasoning applies here: "[E]ven if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof. [Citations.] [¶] . . . It is hardly a difficult concept for the jury to grasp that acquittal is required if there is reasonable doubt as to whether someone else committed the charged crimes," especially when, as in this case "[t]he closing arguments focused the jury's attention on that point." (*Ibid.*)

In this case, the jury was instructed on reasonable doubt with CALCRIM No. 220 that a "defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." The jury could not have understood from the instructions given that Cruz was

19

required to prove that Duarte committed Pinson's murder. Further, defense counsel argued at length that the evidence indicated it was Duarte who killed Pinson. Under the circumstances, the trial court's decision in rejecting Cruz's proposed third party culpability instruction, to the extent it was error, did not affect the outcome and was therefore harmless.

For the same reasons, we reject Cruz's assertion that the trial court compounded any error by misreading CALCRIM No. 359 on corpus delicti (i.e., replacing the words "People have" in the instruction with "defendant has") so that it read in part as, "You may not convict the defendant unless *the defendant* has proved his guilt beyond a reasonable doubt." Assuming this is not a reporter's transcription error, the other instructions made it clear that the People had the burden of proving Cruz's guilt beyond a reasonable doubt.

C. *Modification of CALCRIM No. 521*

The trial court instructed the jury with CALCRIM Nos. 520 and 521 as to murder and first degree murder, respectively.[5]

---

5    The court instructed with CALCRIM Nos. 520 and 521 as follows: "Defendant is charged with murder in violation of Penal Code section 187[, subdivision (a)]. To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant committed an act that caused death of another person; and, two, when the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required. Defendant acted with express malice if he unlawfully intended to kill. The defendant acted with implied malice if, one, he intentionally committed an act; two, the natural and probable consequences of the act were dangerous to human life; three, at the time he acted, he knew his act was dangerous to human life; and four, he deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does

Cruz contends the trial court prejudicially erred by modifying CALCRIM No. 521 to omit the language that "all other murders are of the second degree," so that it assertedly reflected only the theories of felony murder and willful, deliberate and premeditated murder.  He maintains the instructions did not provide an explanation between first and second degree murder and left the jury with an all or nothing proposition: to convict him of first degree murder or acquit him of murder.[6]  The People respond that Cruz forfeited

not require deliberation or the passage of any particular period of time.  [¶]  If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree."  "Defendant is guilty of first degree murder if the People have proved he acted willfully, deliberately, and with premeditation.  [¶]  Defendant acted willfully if he intended to kill.  Defendant acted deliberately if he carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill.  [¶]  Defendant acted with premeditation if he decided to kill before completing the acts that caused death.  [¶]  . . .  [¶]  The requirements for second degree murder based on express or implied malice are explained in CALCRIM [No.] 520, first or second degree murder with malice aforethought.  That was the previous instruction which I read to you.  The People have the burden of proving beyond a reasonable doubt the killing was first degree murder rather than a less [*sic*] crime.  [¶]  If the People have not met the burden, you must find the defendant not guilty of first degree murder."

6      We observe that the language—"all other murders are of the second degree"—was contained in the standard 2009-2010 version of CALCRIM No. 521, but eliminated from the 2011 version of CALCRIM No. 521.  (See CALCRIM No. 521 (2009-2010 ed.) p. 271; CALCRIM No. 521 (2011 ed.) p. 271.)  In the 2011 version of the instruction given in this case, the following language was added:  "[The requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520, *First or Second Degree Murder With Malice Aforethought*.]"  (CALCRIM No. 521 (2011 ed.) p. 271.)  The 2011 version of CALCRIM No. 520 also provides that if there is substantial evidence of first degree murder, the court shall instruct the jury as follows:  "If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree."  (CALCRIM No. 520 (2011 ed.) pp. 264-265.)  In 2013, after Cruz's conviction, this paragraph of CALCRIM No. 520 was amended to read:  "[If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. __.]"  (CALCRIM No. 520 (2013 ed.) p. 240.)

the error by failing to request a clarifying instruction at the time. They argue his contention is meritless in any event because the trial court properly instructed the jury on the elements of first and second degree murder and their respective mental states and the prosecutor explained those principles.

The trial court's omission of language that all murders are second degree unless found to be first degree was not a failure to instruct on an element of second degree murder, nor did it result in the jury hearing an incorrect recitation of the law, which would constitute error. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) The court instructed the jury on the general elements of second degree murder via CALCRIM No. 520, which, as given, stated that to prove defendant is guilty of murder, "the People must prove that, one, the defendant committed an act that caused the death of another person; and, two, when the defendant acted, he had a state of mind called malice aforethought. The instruction also included definitions of express and implied malice.[7] In addition, CALCRIM No. 521, as read to the jury, stated that: "The requirements for second degree murder based on express or implied malice are explained in CALCRIM [No.] 520, first or second degree murder with malice aforethought." The court continued: "That was the previous instruction which I read to you. The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a less [*sic*] crime. [¶] If the People have not met the burden, you must find the defendant not guilty of first degree murder."

---

7    See footnote 5, *ante*, pages 20-21.

Because the trial court accurately instructed the jury on the elements of second degree murder and Cruz failed to object in the trial court to any perceived omission in the jury instructions, or request further clarification or amplification, he forfeited his appellate contention. (*People v. Lee* (2011) 51 Cal.4th 620, 638.) "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*Ibid.*) If he believed the court should have included the language clarifying that murders are second degree unless found to be first degree, Cruz was obliged to request it in the trial court. (*Ibid.*)

### III. *Ruling Regarding Identity of Confidential Informant*

During trial, defense counsel sought disclosure of the name of a paid confidential informant who, in December 2011, was involved in a active criminal investigation into activities of the Mexican Mafia and the person for whom Duarte had sold drugs. The trial court in camera heard testimony from the informant's FBI agent handler about the informant's knowledge of Pinson's murder. It thereafter ruled there was no evidence that the informant could offer testimony about Cruz's participation, guilt or innocence, or Duarte's possible involvement in the murder, and thus it denied defense counsel's motion without prejudice, sealing the transcript of the hearing.

Cruz asked this court to independently review the sealed materials so as to assess the correctness of the trial court's ruling, and the People express no objection. Having done so, we conclude the trial court did not err in denying defense counsel's request to disclose the name of the confidential informant.

23

## IV. *Cumulative Error*

Cruz contends the trial court's errors cumulatively deprived him of a right to a fair trial under the state and federal Constitutions. We have rejected Cruz's claim of evidentiary error, and concluded his contentions of instructional error are either invited, not prejudicial, or forfeited. Having reviewed the entire record and the evidence carefully, we conclude under the circumstances there is no cumulative prejudicial error, and Cruz received a fundamentally fair trial. (Accord, *People v. Linton* (2013) 56 Cal.4th 1146, 1197 [rejecting claim of cumulative error where trial court's errors were waived, forfeited, invited or meritless, and any assumed error was found to be harmless].)

DISPOSITION

The judgment is affirmed.

                                                      O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McDONALD, J.